# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>   Plaintiff,<br><br>   v.<br><br>FLOATME CORP., a corporation,<br><br>JOSHUA SANCHEZ, individually and as an officer of FLOATME CORP., and<br><br>RYAN CLEARY, individually and as an officer of FLOATME CORP.,<br><br>   Defendants. | Case No.  **5:24-cv-00001**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.     The FTC brings this action for Defendants' violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-1691f.  For these violations, Plaintiff seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, ROSCA, 15 U.S.C. § 8403, and ECOA, 15 U.S.C. §§ 1691-1691f, and its implementing rule, Regulation B, 12 C.F.R. § 1002.

## SUMMARY OF THE CASE

2.      FloatMe operates a personal finance mobile application that promises consumers who live paycheck to paycheck short-term cash advances if they enroll in a $1.99-per-month membership plan.  FloatMe debits the monthly membership fee directly from consumers' bank accounts and automatically renews the plan until consumers cancel.

3.      Since launching its app in 2019, FloatMe has used misrepresentations to induce consumers to enroll in a subscription plan.  FloatMe advertises that paying consumers can receive cash advances of up to $50 instantly upon request, and that consumers can receive this amount immediately after signing up.  But consumers can actually receive only $20, at most.  And, as one employee admitted in an internal communication, FloatMe "lie[s]" to consumers who ask how to receive greater advances:  FloatMe tells consumers that their cash advance limit will increase over time pursuant to an automated process, but in fact, there is no such process, and the vast majority of consumers never receive increases.

4.      Further, despite its promise to make cash available "instantly" for only the cost of a subscription, consumers cannot receive money "instantly" unless they pay a surprise fee.  And tens of thousands of other consumers are categorically prohibited from receiving cash advances—even after paying subscription fees—because of FloatMe's refusal to offer cash advances for income that derives from gig work and public assistance such as military benefits and Social Security (both disability and retirement benefits).

5.      FloatMe also repeatedly charges consumers for services without consent.  Many consumers have been double-charged for fees, charged before the agreed-upon repayment date, or charged after cancelling their accounts.  When consumers try to cancel their membership,

FloatMe requires them to navigate faulty cancellation mechanisms that are steeped with friction and dark patterns designed to thwart consumers' attempts to cancel.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

7.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

8.    The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-05, which, *inter alia*, prohibits the sale of goods or services on the Internet through negative option marketing without meeting certain requirements to protect consumers.  A negative option is an offer in which the seller treats a consumer's silence—their failure to reject an offer or cancel an agreement—as consent to be charged for goods or services.  16 C.F.R. § 310.2(w).  The FTC further enforces ECOA, 15 U.S.C. §§ 1691-1691f, which, *inter alia*, prohibits discrimination on the basis that all or part of an applicant's income derives from a public assistance program.

## DEFENDANTS

9.    Defendant FloatMe Corp. is a Texas corporation with its principal place of business at 110 E Houston St., San Antonio, TX 78205-2991.  FloatMe transacts or has transacted business in this District and throughout the United States.  At all times relevant to this

Complaint, acting alone or in concert with others, FloatMe has advertised, marketed, distributed, or sold access to its platform to consumers throughout the United States.

10.    Defendant Joshua Sanchez is an officer, co-founder, and board member of FloatMe.  At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of FloatMe, including the acts and practices set forth in this Complaint.  Sanchez was directly involved in the unlawful practices set forth in this Complaint, including reviewing and approving FloatMe's cancellation practices, advertising claims, and policies regarding cash advance limits.  Sanchez resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

11.    Defendant Ryan Cleary is a co-founder, and former board member and officer, of FloatMe.  At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of FloatMe, including the acts and practices set forth in this Complaint.  Cleary was directly involved in the unlawful practices set forth in this Complaint, including reviewing and approving FloatMe's cancellation practices, advertising claims, and policies regarding cash advance limits.  Cleary resides in Cleveland, Ohio, and in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMERCE

12.    At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

13.     FloatMe operates a mobile app, which is available on the Apple App Store and Google Play Store.  FloatMe advertises its app as a tool that offers short-term cash advances to cover unexpected emergencies.  FloatMe calls its cash advances "Floats" and says consumers can receive amounts "up to $50."  These cash advances are automatically debited from consumers' bank accounts on consumers' next estimated payday.

14.     Consumers must enroll in a FloatMe subscription to receive a cash advance. FloatMe charges monthly fees of $1.99 for a membership (or $4.99 for an MVP membership that also includes access to a secured charge card).  FloatMe subscriptions renew automatically, charging consumers on a recurring basis unless they take affirmative action to cancel.

15.     Consumers can contact FloatMe only by emailing the support team at support@floatme.com or submitting a support ticket through the app.

### FloatMe's Misrepresentations About its Cash Advances

16.     FloatMe advertises its app to consumers who are living paycheck to paycheck, through social media and its website.  FloatMe promises consumers cash advances of up to $50 whenever they need them.  FloatMe tells consumers they can receive cash "instantly," "now," and "in minutes."  FloatMe says its cash advances are delivered fast enough that consumers can rely on the advances for any "unexpected emergency."  FloatMe promises that its cash advances are "free money" with "no hidden fees" and "no interest."  FloatMe reinforces these claims on its website and again during the enrollment process, which consumers complete on the app.

17.     But FloatMe does not offer Floats up to $50 upon enrollment.  To keep customers from cancelling, FloatMe tells them that if they stay enrolled, an automated process will increase their cash advance limit.  But FloatMe does not have any such automated process, and few

paying consumers can access anything near a $50 cash advance even after paying FloatMe's fees for several months. Many other consumers are charged subscription fees even though they were unable to get any cash advances at all. Consumers who do get a cash advance have to pay an additional, undisclosed fee of $4.00 if they want their cash advance to be delivered within two hours. Consumers who do not pay the fee have to wait up to 3 days to receive the "free" funds that FloatMe promises "instantly," "now," and "within minutes."

<u>Misrepresentations in Social Media Advertisements</u>

18.    Since at least 2019, FloatMe has advertised on social media platforms such as Facebook, Instagram, and TikTok. Its ads expressly and prominently tell consumers that they will be able to receive cash advances of up to $50, on demand, if they sign up for a FloatMe membership and download the app. Examples of these ads appear below:




 

19.     FloatMe's ads emphasize that consumers can get up to $50 immediately after downloading the app.  Some of FloatMe's ads convey this message by showing fictitious scenarios where consumers learn about FloatMe and get $50 right after downloading the app. Other FloatMe ads explicitly tell consumers that they need only download the app to get $50. Examples of these ads are below.

 

20.     FloatMe's ads also tell consumers they can choose the amount of the cash advance they want to receive.  In numerous ads, FloatMe shows consumers selecting their cash advance amounts from $20 to $50.  Examples of these ads appear below.




21.     FloatMe also uses video ads, typically in the form of mock testimonials, on social media platforms such as TikTok and YouTube.  These ads regularly show actors describing an emergency or other situation where they need cash immediately.  In the ads, the actor learns about FloatMe, quickly signs up, and gets a $50 cash advance, instantly and for no additional fees, during their first use of the app.  In one such advertisement, for example, the actor says:

> I was low on cash and needed gas. I did not know what to do. I downloaded the FloatMe app and got instant cash. There was no interest and no credit check. I got $50 instantly and was able to get gas and go about my day. FloatMe is literally a lifesaver for a rainy day and emergency cash.

22.     In these video advertisements, FloatMe emphasizes how consumers can get a $50 cash advance instantly, right after enrolling, for "no hidden fees."  Others say FloatMe's cash advances are "free" or "free money."  For example, in one such advertisement, the actor

responds to a purported consumer asking how to "get emergency cash deposited instantly."  The actor answers: "All you have to do is download the FloatMe app.  It's free.  It's easy to get to. Sign up for the membership and get $50, free money."  At the end of the ad, the monthly subscription price of $1.99 appears in small font on the bottom of the screen.  Two screenshots from this video are below.  During the first screenshot, the actor verbally claims that she received $50 instantly after downloading the app.  That claim also appears in text on the screen.  The second screen, which appears after the actor claims a Float is "free money," mentions only the $1.99 subscription fee, and only in tiny font.

 

23.    Below are other screenshots from similar video ads where consumers are told they can receive "up to $50" "now" for "free" immediately after downloading the app:





<u>Misrepresentations During the Enrollment Process</u>

24.    Consumers can download the FloatMe app on the Apple App Store or Google

Play Store.  To reach FloatMe's app store listing, consumers can either search the app store or go

to FloatMe's website and request an app store link.  As explained below, FloatMe's website and

app store listings repeat FloatMe's deceptive promises that consumers can receive Floats "up to

$50" within "minutes" for "just $1.99/month."  As further explained, FloatMe repeats these

deceptive claims during the enrollment process in the app.

25.    FloatMe's website, www.floatme.com, has claimed that consumers can get

"Floats up to $50 between paydays" for "$1.99/month."  FloatMe's website has also expressly

claimed that it charges "No Hidden Fees" for "Instant Cash Advance[s]."  Below is a screenshot

showing what consumers have seen when navigating FloatMe's website.



26.     FloatMe reinforces these representations on its app store pages.  Consumers can download FloatMe's app from the Apple App Store or the Google Play Store.  Both app store pages prominently include featured screenshots from the app that inform consumers they can receive a "Cash advance up to $50" and "Money in minutes."  One screenshot claims that the app allows consumers to pick their desired cash amount between $10 to $50.  The next screenshot shows a successful cash advance of $20 that will be delivered instantly.  Below are images of what consumers have seen when navigating the Apple App Store and Google Play Store pages.





27.     During the enrollment process, FloatMe continues to tell consumers that they can instantly receive up to $50 for only the cost of their subscription.  After consumers download the app, they are shown a carousel of app features, including one advertising "Instant cash advances" of "up to $50."

28.     During the signup process, FloatMe tells consumers that they can "Instantly Float up to $50" for a monthly fee of $1.99.  FloatMe also promises consumers they can "Cancel anytime for any reason by contacting support."

29.     Below are the screens consumers are shown during signup and enrollment.  The first screen shows FloatMe's claims about providing "Instant cash advances" of "up to $50." The second screen shows FloatMe's representation that consumers can "Instantly Float up to $50" for "$1.99/mo" and FloatMe's promise that consumers can cancel by contacting customer support.




13

**FloatMe Does Not Provide Floats up to $50 Upon Enrollment**

30.     Despite FloatMe's numerous and prominent claims that it will provide cash advances of up to $50, no consumers can receive this amount upon enrollment.  FloatMe instead limits the amount consumers can receive at signup to, at most, $20.  And despite its claims that most consumers will see increases if they remain enrolled, *less than 5%* of consumers received a Float of more than $20 in the most recent quarter, even after paying subscription fees for months or even years.  During that same time period, only one half of one percent of consumers received a $50 Float.

31.     For many other consumers, FloatMe deems them ineligible to request a cash advance based on limitations that are hidden from consumers during the enrollment process.  For example, after the enrollment process is complete, consumers learn that FloatMe requires consumers to meet certain income thresholds to obtain an advance.  In making this assessment, however, FloatMe excludes income from several common sources, including gig work, commissioned or tipped work, pensions, military benefits, and government assistance programs. FloatMe does not tell consumers it does not consider income from these sources.  At least tens of thousands of paying consumers have been prevented from even requesting a cash advance because of these undisclosed eligibility requirements.  These consumers are still charged subscription fees, even though FloatMe deems them categorically ineligible to receive Floats.

32.     Despite its "up to $50" claims, FloatMe does not disclose that consumers will receive much less than that amount anywhere in its advertising or enrollment process.  Not until learning of the FTC's investigation did FloatMe adjust its website to remove the specific "up to $50" claim.  But FloatMe continues to promote cash advances of "up to $50" on its app unabated.

33.     Many consumers believe FloatMe's promises that they can get $50 upon enrolling.  As one consumer stated in a complaint to FloatMe, "[w]hy not $50 as advertised . . . [a]d says I can borrow up to $50 instantly."  Another consumer told FloatMe, "[w]hen I originally saw the ad for float me, it stated to get a 50.00 float till payday but when I signed up it only allowed me to get 20."

34.     Many other consumers have told FloatMe that they would not have enrolled had they known FloatMe would advance less than promised:  for example, one consumer said the "only reason I joined was because I need 50 bucks until payday [but] you are only offering 20." Another consumer added, "[p]lease close [my account].  Your app is misleading.  It said it would float $50 and you guys only offered $20.  Its not worth it."

35.     FloatMe initially considered providing $50 cash advances to consumers upon enrollment before deciding on a $20 maximum limit.  Citing "cash constraints," Defendant Sanchez admitted in a message to Defendant Cleary that FloatMe needed to abandon prior plans to give a $50 cash advance to consumers upon enrollment.

**FloatMe Continues to Deceive Consumers by Promising "Automatic" Float Limit Increases After They Have Enrolled**

36.     After consumers learn that they can receive only up to $20 upon enrollment, FloatMe tells consumers their Float limits are likely to increase "automatically" if they stay enrolled.  When consumers email FloatMe to inquire about increases, FloatMe reiterates that "Float Limits are set automatically by the Float system" and that "Float limits cannot normally be changed by our support team."  In other communications, FloatMe representatives say they cannot accommodate the consumer, because the "system" or "algorithm" decides.  FloatMe also tells consumers who ask for an increase that "[m]ost members see their limit increase over time as we get to know you better."

15

37.    In reality, cash advance limits are not "automatically" increased by "the Float system" or an "algorithm" as the company "gets to know [consumers] better."  Float limits are increased manually by FloatMe's support team only in limited instances, based on undisclosed criteria, and only upon an explicit consumer request, despite FloatMe telling consumers who make those requests that "Float limits cannot normally be changed by our support team."

38.    FloatMe acknowledges in internal documents and communications that it is lying to consumers when it claims that consumers' cash advance limits will be increased "automatically" by "the Float system."   In one such communication, a supervisor described FloatMe's statements to its consumers as "a lie."  In another internal document, FloatMe acknowledges that even though its "official stance is that [customer] support can't increase float limits," support does increase limits for certain consumers if they request an increase.

39.    FloatMe also tells consumers, in a support article drafted by Defendant Cleary, that consumers can earn limit increases by, for example, "turning on recurring saving contributions" and "having funds left over each payday."  But FloatMe, in reality, instructs its customer support agents to give a Float increase only if the consumer has been subscribed for at least five months, repaid nine consecutive Floats on time, and averages at least $600 in their last three paychecks.  Indeed, FloatMe's director of operations instructed support agents to avoid granting increases for newly joined consumers "even if they have a ton of income."

40.    Despite FloatMe's claims that "the Float system" "automatically" increases cash advance limits for "[m]ost members," numerous consumers have complained to FloatMe about their cash advance limits not being increased.  One consumer noted, "I have been using this app faithfully for a few months now and I bring in way over [$]1,000 every 2 weeks but my borrow amount has never increased.  I've read the FAQS and it said your borrowing amount increases as

long as your income is consistent and your [sic] paying the money back in a timely manner and I

have been doing both so why hasn't my amount increased?"  Another consumer wrote,

"[FloatMe] said it wouldn't take long for an increase. . .$20 not to [sic] much help."

### FloatMe Misrepresents that Instant Transfers Are Free

41.    As noted above, FloatMe tells consumers that they can receive "emergency cash"

and "Money in minutes" for "free" and with "no hidden fees."  It doubles down on this

representation in the enrollment flow when it tells consumers that they can "Instantly Float"

money for only the cost of a subscription—$1.99 a month.

42.    In reality, consumers can receive money "instantly" or "in minutes" only if they

pay a hidden $4 fee.  If consumers wish to receive a cash advance without paying an additional

fee, they must wait up to three days for the money to be deposited into their account.  FloatMe

reveals the three-day waiting period only after consumers sign up, give FloatMe access to their

bank account, and agree to pay the monthly subscription fee for access to "instant" Floats.

43.    FloatMe does not disclose the fee during the enrollment process.  Quite the

opposite:  FloatMe hides it.  FloatMe shows the screen-by-screen process for receiving a cash

advance in its video advertisements and on its app store listings.  But the screenshot sequence

omits two screens that FloatMe displays when enrolled consumers request a cash advance—the

screens that show the undisclosed $4 fee that is required to receive the cash advance instantly.

Only after the FTC's investigation began did FloatMe add anything about the $4 fee for instant

advances to its website; even then, FloatMe buried any mention of the fee in the bottom half of

its website, after multiple links inviting consumers to leave the site to download the app.

44.    Consumers regularly complain that FloatMe does not offer cash advances "in

minutes" for "free" with "no hidden fees," as it advertises.  Many consumers say they would not

17

have enrolled in the app if they had known they had to pay a fee for a cash advance that was promised "instantly." Consumers note that the $4 fee, in addition to the $1.99 monthly fee, is significant when compared to the true average advance amount of $20. One such consumer said, "[t]he app is not very helpful for my finances because I'm not paying a $4 fee to get a measly $20 instantly deposited in my account."

45.    Other consumers have explained that they would not have enrolled if they knew they could not get instant cash advances without paying extra. As one consumer stated, "[the app is] pointless. They said I could use $20 then wanted to charge $4 in order for me to have instant access to it otherwise it would be 2-3 days before it got to my account then the money is due in 5 days from the point you asked for it." Another consumer wrote that they were "V[ery] FRUSTRATED" because the "$20 OFFER [was] cut to $16 after [a] surprise $4 FEE at [the] last second."

**FloatMe Charges Consumers Without Consent**

46.    In addition to the fees FloatMe collected from consumers after misrepresenting its service, the company charges many consumers without consent. These charges include multiple subscription fee charges for the same billing period, charges for cash advance repayments earlier than agreed, multiple charges for the same cash advance repayment, and charges after consumers cancel their subscription.

47.    FloatMe is aware that it charges consumers without permission. For example, shortly after FloatMe launched its app, Defendants Sanchez and Cleary commented that consumers had been "double or triple" charged by FloatMe. Cleary also acknowledged that FloatMe double-and-triple-billed consumers because he and Sanchez were more focused on fundraising than accurate billing. "The issue was us running two instances while fundraising,

while pushing out to members without fixing shit," Cleary wrote. Yet FloatMe continued this practice for years. Two years after Cleary's email blaming a fundraising push for the problem, one FloatMe supervisor told another that she was trying to fix billing issues that caused FloatMe to charge consumers multiple times but she "could tell no one cared to solve the issue." The supervisor explained that she "got the sense [that] no one thinks it's a big deal . . . because [the subscription fee is] $2." Months later, the supervisor told another employee that the "[n]umber one complaint [from consumers] is being charged so many times [o]r randomly on a random month."

### **FloatMe "Make[s] it Difficult for [Consumers] to Quit"**

48.     As Sanchez admitted in internal documents, FloatMe explicitly designed its cancellation processes to thwart consumers' ability to cancel so that the company could reap more subscription fees. FloatMe's original cancellation process was manual-only, delay-filled, and error-ridden. And the current processes, as Sanchez explicitly admitted in an internal communication, "make it difficult for someone to quit" and employ "friction."

#### FloatMe's Original Cancellation Process

49.     When FloatMe's app first became available, there was no cancellation mechanism in the app or on the website. Instead, FloatMe required consumers to email customer support to cancel. But when consumers did so, they often faced substantial, unexplained delays or errors in processing before the cancellation was honored. All the while, FloatMe continued to charge those consumers subscription fees.

50.     Internal communications show FloatMe was aware that delayed cancellations were endemic. In 2020, for example, Cleary admitted that FloatMe's customer support department lacked the staff to timely process cancellation requests. Cleary wrote that FloatMe

only had "2 people actively handling customer [support]" despite there being 40,000 consumers

on the platform—consumers who could cancel their subscription only through a customer

support agent.

FloatMe's Other "Difficult" Cancellation Paths

51.    In 2020, in response to numerous customer complaints and negative app store

reviews, and to alleviate "pressing [] support issues," FloatMe launched two alternative

cancellation paths.  But, as Sanchez said, both were explicitly designed to "make[] it difficult for

someone to quit."

52.    As Sanchez admitted, a friction-filled cancellation path was part of FloatMe's

growth strategy.  Around the time the other cancellation paths were developed, Sanchez noted

that FloatMe had "**maintained strong user retention by only allowing cancellation via**

**support tickets**."  The other cancellation paths, he said, would be "more automated" but "**still**

**feature[] some friction**" (emphasis added).

53.    Under Sanchez and Cleary's leadership, FloatMe launched two additional

cancellation paths that, in Sanchez's words, "of course make[] it difficult for [consumers] to

quit."  These new paths are an online webform and an in-app cancellation process.  Along with

these two new paths, FloatMe tells consumers they can still contact customer support to cancel.

Each of these three paths continue to frustrate customers' attempts to cancel their subscriptions.

54.    First, consumers who attempt to use FloatMe's in-app cancellation path regularly

experience technical issues that prevent them from cancelling their account.  Consumers report

the in-app cancellation path is "faulty."  For years, consumers have regularly complained to

FloatMe that they were unable to cancel on the app because the "cancel" buttons were not

working or because other chronic problems with the app prevented cancellation.

20

55.     Second, FloatMe often fails to honor the cancellation requests of consumers who attempt to cancel using the webform.  The webform requires consumers to enter the email address that they used to register for a FloatMe account and answer questions about why they are cancelling.  After submitting the form, consumers receive a message that says:  "Your request is being automatically processed.  You will receive a confirmation email shortly if the email matches an open account."  The consumer can then exit the form.

56.     But FloatMe rejects the request—*without notifying the consumer*—if the consumer has not repaid all their cash advances or if the email address entered by the consumer does not match exactly the information in FloatMe's system.  In both instances, FloatMe continues to automatically deduct subscription fees from the consumers' bank accounts.

57.     FloatMe is aware that this problem with its webform has led to consumers continuing to be charged after they submitted a cancellation request.  In January 2022, for example, a FloatMe employee wrote that "[o]ne of the biggest issues I've seen" is that the webform cancellation process causes consumers "to get charged for months without knowing."

58.     Third, attempts to cancel through customer support are similarly plagued by lengthy and friction-filled processes.  In almost every case, customer support agents ignore consumers' cancellation requests.  Many times, they send a prewritten script asking the customer to describe their problems with the app.  FloatMe refers internally to this script as the "Cancel Prevention macro."  Other times, customer support responds to a cancellation request by telling consumers to cancel another way, even though many consumers say they are contacting support because they tried to cancel through one of the other paths but failed for the reasons stated above.

59.     FloatMe's failure to timely process consumers' cancellation requests—via the app, the webform, or customer support—frequently results in consumers continuing to pay the monthly membership fee for a service they are not using and do not want.

60.     Consumers have complained that FloatMe has ignored their cancellation requests and continued to charge them.  As one consumer said, "I contacted you guys [two months ago] and im still getting charged."  Another consumer said she twice attempted to cancel using the webform but had not received a response and was "continuing to be charge[d] for [her] membership."  The support agent who was assigned to these two tickets and was responsible for addressing these consumers' complaints was Defendant Cleary, who was regularly involved in responding to consumers who contacted FloatMe's customer support department.  Below is a sample of additional consumer complaints regarding FloatMe's difficult cancellation paths (emphasis added).

- I downloaded the app for this company.  I was not eligible for loans so I canceled my membership . . . . They have continuously charged me monthly, **I have canceled my subscription three times on the app, emailed them three times, received responses confirming cancellation, and they are still charging me monthly**.

- I closed my account **several months ago** but I woke up yesterday to my account going negative because they billed me for a subscription. . . and **it's nearly impossible to get ahold of anybody in customer service**.  Scam company

- I signed up, wasn't eligible for whatever reason, then canceled my membership shortly after.  The next month, on September 16, the app charged me $2.99 for a membership fee.  I was angry, so I downloaded the app and canceled my membership again.  I considered it user error and blamed myself.  Then on October 16, I was charged $2.99 again and my membership was seemingly reactivated.  I downloaded the app, canceled my membership again and contacted support.  Customer support claims there was no cancelation request until October 16 which I absolutely know is a lie or a fault in their system.  Clearly **the developers created a faulty app with a spotty cancelation feature** to pull $2.99 from unsuspecting accounts.

- I was told the solution to cancelling the membership was a link I could click to fill out a cancellation form, once I clicked the link the page was expired and **I have absolutely no way to get them to stop charging me money. I downloaded this app because I was struggling and needed help and all it has done is make things worse** and never offer remedy.

- I went to go and cancel my subscription and delete the app because it seemed it wasn't worth it. **No buttons are working**. My cancel membership isn't working, neither is the contact support working. I just wish to cancel my membership please.

**<u>FloatMe Discriminates Against Consumers Who Receive Public Assistance Benefits</u>**

61.    FloatMe provides cash advances to its consumers and allows consumers to defer the repayment of the cash advance until their next paycheck, as detailed above.  FloatMe's cash advance service is the primary feature of its app, as evidenced by the company's advertisements. When a consumer receives a cash advance from FloatMe, they incur an obligation to repay and provide authorization for FloatMe to debit their bank account to collect repayment.

62.    FloatMe ignores income derived from any public assistance program when it evaluates whether consumers are eligible to request a cash advance or the amount consumers can receive as a cash advance.  Instead, FloatMe deems consumers ineligible to receive a cash advance if their income derives wholly from public assistance, including Social Security retirement benefits, Social Security Disability Insurance, military benefits, or unemployment benefits.  If consumers have income that is a combination of funds from a non-public assistance program and a public assistance program, FloatMe will not consider the income derived from a public assistance program when deciding the amount the user can receive as a cash advance.

63.    While refusing to offer cash advances to consumers whose income derives from public assistance programs, FloatMe nonetheless enrolls such consumers and charges them subscription fees.  Internal FloatMe records show that tens of thousands of consumers have been

charged fees by FloatMe even though they are categorically unable to receive a cash advance because of FloatMe's blanket (and hidden) policy of refusing to consider income derived from a public assistance program.

64.    FloatMe's public assistance policy is not mentioned in its advertisements, website homepage, app store listings, or during enrollment.  Instead, FloatMe mentions the policy in the "FAQ" section of its website (which, as noted above, consumers need not visit in order to enroll).

65.    Charging consumers a membership fee to obtain cash advances while categorically prohibiting them from receiving cash advances based on a policy of excluding public assistance income has no countervailing benefits to consumers or competition.

66.    Consumers have long told FloatMe that they were surprised that FloatMe does not consider income from public assistance programs to be "income" and that FloatMe continues to charge them even though they are categorically ineligible to receive a cash advance.  One consumer wrote, "I get social Security and I've been paying that $1.99 or whatever it is you're charging me and haven't been able to get a [cash advance] so if you can't float me the $20 that it offered and refund me my money and cancel my membership I'm not paying you for nothing."  Another consumer told FloatMe, "your service always denies me because I am disabled and get a steady monthly income from social security once a month since 2012, but according to you[], I have no valid income history."

67.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

68.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

69.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

70.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

### Count I

### Deceptive Claims Regarding Cash Advances

71.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their cash advance services, including through the means described in Paragraphs 13-66, Defendants represent directly or indirectly, expressly or by implication, that consumers who enroll in Defendants' membership program can get cash advances of up to $50.

72.     Defendants' representations as described in Paragraph 71 are false or misleading or were not substantiated at the time the representations were made.

73.     Therefore, Defendants' representations as described in Paragraph 71 constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count II

### Deceptive Claims Regarding the Charge for Instant Cash Advances

74.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their cash advance services, including through the means described in

Paragraphs 13-66, Defendants represent directly or indirectly, expressly or by implication, that consumers who enroll in Defendants' membership program can get cash advances immediately at no extra cost.

75.     Defendants' representations as described in Paragraph 74 are false or misleading or were not substantiated at the time the representations were made.

76.     Therefore, Defendants' representations as described in Paragraph 74 constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III

### Unfair Discrimination

77.     In numerous instances, as described in Paragraphs 13-66, Defendants discriminated against consumers whose income was derived from public assistance programs, including by refusing to provide cash advances to such consumers while charging them recurring membership fees.

78.     Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

79.     Therefore, Defendants' acts or practices as described in Paragraph 77 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## Count IV

### Unfairly Charging Consumers Without Consent

80.     In numerous instances, as described in Paragraphs 13-66, Defendants charge consumers without consent.

81.     Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

82.     Therefore, Defendants' acts or practices as described in Paragraph 80 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

83.     In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 et seq., which became effective on December 29, 2010.  Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce.  To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business."  Section 2 of ROSCA, 15 U.S.C. § 8401.

84.     Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, (2) obtains the consumer's express informed consent before making the charge, and (3) provides a simple mechanism to stop recurring charges.  15 U.S.C. § 8403.

85.     The TSR defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).

86.     As described in Paragraphs 13 to 66 above, Defendant has advertised and sold its FloatMe membership through a negative option feature as defined by the TSR.  16 C.F.R. § 310.2(w).

87.     Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is treated as a violation of a rule promulgated under the FTC Act regarding unfair or deceptive acts or practices.

### Count V

### Failure to Provide Required Disclosures

88.     In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 13 to 66 above, Defendants have failed to clearly and conspicuously disclose before obtaining consumers' billing information all material transaction terms, including the following:

> a)     That most consumers cannot obtain cash advances in the amount advertised by the company; and
>
> b)     That consumers cannot obtain cash advances immediately unless they pay an additional fee.

89.     Therefore, Defendants' acts or practices, as described in Paragraph 88 above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

**Count VI**

**Failure to Obtain Express Informed Consent Before Charges**

90.     In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 13 to 66 above, Defendants have failed to obtain a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction.

91.     Therefore, Defendants' acts or practices, as described in Paragraph 90 above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

**Count VII**

**Failure to Provide Simple Mechanisms for Stopping Recurring Charges**

92.     In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 13 to 66 above, Defendants have failed to provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

93.     Therefore, Defendants' acts or practices, as described in Paragraph 92 above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

**VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT AND REGULATION B**

94.     Section 701(a)(1) of the ECOA, 15 U.S.C. § 1691(a)(1), and Section 1002.4(a) of Regulation B, 12 C.F.R. § 1002.4(a), prohibit a creditor from discriminating against an applicant with respect to any aspect of a credit transaction on the basis of race, color, religion, national origin, sex, marital status, or age (provided the applicant has the capacity to contract); because all

or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act, 15 U.S.C. Ch. 41.

95.    Defendants are creditors as defined in Section 702(e) of the ECOA, 15 U.S.C. § 1691a(e), and Section 1002.2(l) of Regulation B, 12 C.F.R. § 1002.2(l).

96.    Defendants extend credit as defined in Section 702(d) of the ECOA, 15 U.S.C. § 1691a(d), and 1002.2(j) of Regulation B, 12 C.F.R. § 1002.2(j).

97.    Defendants grant consumers the right to defer payments of debts or to incur debts and defer their payment or to purchase property or services and defer payment therefor.

98.    Section 704(c) of the ECOA, 15 U.S.C. § 1691c(c), specifically empowers the Commission to enforce the ECOA. Defendants' violations of the ECOA are deemed to be violations of the FTC Act and are enforceable as such by the Commission under that Act. Further, the Commission is authorized to use all of its functions and powers under the FTC Act to enforce compliance with the ECOA by any person, irrespective of whether that person is engaged in commerce or meets any other jurisdictional tests set by the FTC Act. This includes the power to enforce a Consumer Financial Protection Bureau regulation promulgated under the ECOA, such as Regulation B, in the same manner as if a violation of that regulation had been a violation of an FTC trade regulation rule.

## Count VIII

### Discriminatory Financing Practices

99.    In numerous instances, Defendants refuse to provide cash advances to applicants whose income derives from public assistance programs, as described in Paragraphs 13 to 66 above.

100.    Therefore, Defendants' acts, policies, or practices as described in Paragraph 99 constitute discrimination against applicants with respect to any aspect of a credit transaction because all or part of the applicant's income derives from any public assistance program in violation of Section 701(a)(2) of the ECOA, 15 U.S.C. § 1691(a)(2), and Section 202.4(a) of Regulation B, 12 C.F.R. § 1002.4(a).

## CONSUMER INJURY

101.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, ROSCA, and ECOA.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act, ROSCA, and ECOA by Defendants;

B.    Award monetary and other relief within the Court's power to grant; and

C.    Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated:  January 2, 2024


ANGEL E. REYES
JAMES I. DOTY

Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Mailstop CC-10232
Washington, D.C. 20850
Tel:  202-326-2872 (Reyes)
Tel:  202-326-2628 (Doty)
AReyes@ftc.gov
JDoty@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION